In re STONE & WEBSTER, INCORPORATED; 1430 Enclave Parkway Corporation; 245 Summer Street Corporation; AEC International Projects, Inc.; Associated Engineers & Consultants, Inc.; Auburn VPS General Corporation; Auburn VPS Limited Corporation; Belmont Constructors Company, Inc.; Commercial Cold Storage, Inc.; DSS Engineers, Inc.; Enclave Parkway Realty, Inc.; Fast Supply Corporation; GSES Holding, LLC; International Engineers and Constructors, Incorporated; Nordic Holdings, Inc.; Nordic Investors, Inc.; Nordic Rail Services, Inc.; Nordic Refrigerated Services, Inc.; Nordic Refrigerated Services, Limited Partnership; Nordic Transportation Services, Inc.; Polar Transport, Inc.; Power Technologies, Inc.; Prescient Technologies, Inc.; Projects Engineers, Incorporated; Rockton Associates, Incorporated; Rockton Technical Services Corporation; Sabal Corporation; Sabal Real Estate Corporation; Saw Consulting Services, Inc.; SC Wood, LLC; Selective Technologies Corporation; Sleeper Street Realty Corporation; Stone & Webster ABU DHABI (United ARAB Emirates), Inc.; Stone & Webster Asia Corporation; Stone & Webster Auburn Corporation; Stone & Webster Bharat, Incorporated; Stone & Webster Binghamton Corporation; Stone & Webster Civil and Transportation Services, Inc.; Stone & Webster Construction Company, Inc.; Stone & Webster Development Corporation; Stone & Webster Dominican Republic, Incorporated; Stone & Webster Engineers and Constructors, Inc.; Stone & Webster Far East Technical Services Corp.; Stone & Webster Indonesia Corporation; Stone & Webster Industrial Technology Corporation; Stone & Webster Inter–American Corporation; Stone & Webster International Corporation; Stone & Webster International Projects Corporation; Stone & Webster Italia, Incorporated; Stone & Webster Korea Corporation; Stone & Webster Kuwait, Incorporated; Stone & Webster Overseas Development Corporation f/k/a Stone & Webster Lithuania Corporation; Stone & Webster Management Consultants, Inc.; Stone & Webster Middle East Engineering Services Corporation; Stone & Webster of Argentina Corporation; Stone & Webster of Mexico Engineering Corporation; Stone & Webster Oil Company, Inc.; Stone & Webster Operating Corporation; Stone & Webster Overseas Consultants, Inc.; Stone & Webster Overseas Group, Inc.; Stone & Webster Pacific Corporation; Stone & Webster Power Engineering Corporation; Stone & Webster Power Projects Corporation; Stone & Webster Procurement Corporation; Stone & Webster Puerto Rico, Incorporated; Stone & Webster Saudi Arabia, Incorporated; Stone & Webster Taiwan Corporation; Stone & Webster Technology Corporation; Stone & Webster Wallingford Corporation; Stone & Webster Worldwide Engineering Corporation; SWL Corporation; Stone & Webster Engineering Corporation; and Stone & Webster Michigan, Inc., Debtors.

Nos. 00–2142 through 00–2214.

United States Bankruptcy Court, D. Delaware.

Nov. 21, 2001.

Gregg M. Galardi, and Mark A. Fink, Skadden, Arps, Slate, Meagher & Flom LLP, Wilmington, Delaware; Edward J. Meehan, and David E. Carney, Skadden, Arps, Slate, Meagher & Flom LLP, Washington, D.C.; for Debtors.

Michael B. Joseph, and Theodore J. Tacconelli, Ferry & Joseph, PA, Wilmington, Delaware; William J. Kayatta, Jr., Pierce Atwood, Portland, Maine; for Maine Yankee Atomic Power Company.

Adam G. Landis, Kathleen P. Makowski, Klett Rooney Lieber & Schorling, Wilmington, Delaware; Anthony Princi, and Lorraine McGowen, Orrick, Herrington & Sutcliffe LLP, New City; Neal Wolf, Orrick Herrington & Sutcliffe LLP; for Official Committee of Unsecured Creditors.

## MEMORANDUM OPINION

McKELVIE, District Judge.

This is a commercial dispute that arises in the context of a bankruptcy action.

Stone & Webster Incorporated ("SWINC") is a Delaware corporation with its principal place of business in Boston, Massachusetts. SWINC owns one hundred percent of the shares of its subsidiary, Stone & Webster Engineers and Constructors, Inc. ("SWE & C"), a Maryland corporation with its principal place of business in Boston, Massachusetts. In turn, SWE & C owns one hundred percent of the shares of its subsidiary, Stone & Webster Engineering Corporation ("SWEC"), a Massachusetts corporation with its principal place of business also in Boston, Massachusetts. The court will refer to these three companies collectively as "the debtors."

Maine Yankee Atomic Power Company is a Maine corporation with its principal place of business in Wiscasset, Maine. Maine Yankee owns a nuclear power generating facility in Wiscasset, Maine that is the subject of this dispute.

In September 1998, Maine Yankee and SWEC entered into an agreement to decommission Maine Yankee's nuclear power plant. Under the Agreement, SWINC and SWE & C guaranteed the performance of SWEC. On May 4, 2000, Maine Yankee issued a notice to SWEC purporting to terminate the agreement based on SWEC's insolvency and its failure to adequately perform under the Agreement.

On June 2, 2000, the debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 101–1330. Maine Yankee filed proofs of claim in the bankruptcy cases of the three debtors on August 23, 2000, each in the amount of $78.2 million. It filed claims against SWEC under the Decommissioning Agreement and against SWINC and SWE & C as guarantors of SWEC's performance under the Agreement. The debtors filed objections to Maine Yankee's claims on November 16, 2000.

On February 13, 2001, the court held a one-day non-jury trial to consider Maine Yankee's claims and the debtors' threshold defenses. In an opinion dated July 26, 2001, the court refused to disallow Maine Yankee's claims. It did permit, however, SWEC to assert its own claims against Maine Yankee for work performed by SWEC that was uncompensated by Maine Yankee. Any damages proven by SWEC could then be a set-off against Maine Yankee's claims.

Beginning July 6, 2001, the debtors filed additional motions for partial summary judgment on issues relating to damages. Five partial summary judgment motions have been submitted by the debtors, including: (1) a motion to limit damages to the cap contained in the Decommissioning Agreement; (2) a motion to find Maine Yankee's damages are unripe; (3) a motion to find Maine Yankee's proof of claim contains double-counted damages; (4) a mo-

tion seeking summary judgment on SWEC's defense that Maine Yankee failed to mitigate its losses by accepting the tender of performance by SWINC and SWE & C; and (5) a motion seeking summary judgment on SWEC's defense that Maine Yankee failed to mitigate its losses by accepting the offer of the Shaw Group, the entity that purchased the debtors' assets. The Official Committee of Unsecured Creditors has joined the debtors' first motion for partial summary judgment on the contractual damages cap.

The court heard oral argument on the motions on September 26 and 27, 2001. The parties resolved the third motion for partial summary judgment on double-counted damages at the hearing. At a telephone conference on November 15, 2001, SWEC requested the court delay its consideration of its fifth motion—failure to mitigate by accepting the Shaw Group offer. This is the court's ruling on the remaining motions.

I. FACTS AND PROCEDURAL HISTORY

The court draws the following facts from the testimony presented at the February 13, 2001 hearing and the affidavits and documents submitted in support of, and in opposition to, SWEC's motions.

Effective August 31, 1998, Maine Yankee and SWEC entered into an agreement entitled "Agreement Between Maine Yankee Atomic Power Company and Stone & Webster Engineering Corporation for the Decommissioning of the Maine Yankee Plant" (the "Decommissioning Agreement"). It provided that SWEC would decommission Maine Yankee's Wiscasset nuclear power plant and complete fuel storage installation at a cost of $250,600,000. SWE & C provided a guarantee of SWEC's performance under the Agreement, which contained a target date

for completion of April 30, 2004. The Agreement provides that it will be governed by Maine law. Several of the Decommissioning Agreement's provisions are relevant to these motions.

Under the Decommissioning Agreement, SWEC was responsible for completing the project and it was its duty to manage and pay subcontractors. Pursuant to Articles 4.2 and 4.4 of the Agreement, Maine Yankee paid SWEC part of the contract price every month, based on monthly invoices SWEC submitted for itself and the subcontractors based on earned value and for reimbursable charges incurred, as those terms are defined in the Agreement. Article 30.1 obligates SWEC to waive any rights to a mechanic's lien upon payment of services and requires it to obtain written waivers of such liens from the subcontractors.

Article 11 of the Decommissioning Agreement governs default. Article 11.4 addresses the damages that can be recovered by Maine Yankee for SWEC's breach. It states:

> If the unpaid Agreement funds, including any funds payable to Maine Yankee by reason of letter of credit, performance bond or insurance coverage, fail to compensate Maine Yankee for the total direct damages and costs incurred by Maine Yankee to finish the Work, [SWEC] shall pay such difference to Maine Yankee within thirty (30) days following receipt of an undisputed invoice from Maine Yankee. This obligation for payment shall survive the termination of the Agreement or relevant portion thereof.

The "unpaid Agreement funds" are the portion of the $250.6 million contract price not yet paid by Maine Yankee to SWEC pursuant to SWEC's monthly invoices.

Article 30 of the Agreement, entitled "Limitation of Liability," sets forth the parameters of SWEC's liability under the Decommissioning Agreement. Article 30.2, states the following:

> Notwithstanding any other provision of this Agreement to the contrary, [SWEC's] and its Subcontractors' (of any tier) and their employees' and affiliated companies total aggregate liability from any and all claims, arising out of or in connection with its services hereunder, . . . shall in no event exceed $65,000,000, plus the proceeds from the insurance provided pursuant to this Agreement in the aggregate for all claims. Maine Yankee hereby releases and agrees to defend and indemnify [SWEC] and its Subcontractors (of any tier), and their affiliates and employees from any further liability for any loss or damage in excess thereof. . . .

Article 30.2 goes on to state that performance bonds, letters of credit, retentions, and parent guarantees provided pursuant to the Agreement are provided only as a security and do not increase the limitation on liability. Article 30.3 further explains the scope of the limitations on liability. It states:

> Maine Yankee's remedies specified in this Agreement are Maine Yankee's exclusive remedies for liabilities of [SWEC] arising under this Agreement. The limitations on liability, waivers and indemnity provisions expressed in this Agreement (a) shall apply to the full extent permitted by law, (b) shall apply even in the event of [SWEC's] or its Subcontractors' or their employees, agents and affiliated companies' fault, negligence (in whole or in part), strict liability, or other basis of liability, and whether liability is founded in contract, tort, or otherwise, and (c) shall extend to the benefit of [SWEC] and its Subcontractor (of any tier), and their affiliated and parent companies and their and

**6**

their [sic] shareholders, directors, officers, employees, contractors, and suppliers.

Appendix I of the Decommissioning Agreement contains the "Parent Guarantee Form" of SWE & C. An identical guarantee form was executed by SWINC in December 2000 and appended in Addendum No. 3 of the Agreement. Each of the two guarantee forms states that the guarantor "guarantees [SWEC's] performance of the Agreement up to an amount equivalent to fifty percent (50%) of the Agreement's unpaid balance of the contract price (as such term is defined in the Agreement) at the time of [SWEC's] failure to perform the Agreement." Thus, both SWINC and SWE & C provided a guarantee of SWEC's performance in the amount of half of the unpaid balance of the contract price.

On November 18, 1999, Maine Yankee gave SWEC formal notice of default under Article 11 for a number of breaches of the Decommissioning Agreement, including SWEC's failure to pay subcontractors. On November 30, 1999, SWEC and Maine Yankee agreed to Addendum No. 3 of the Decommissioning Agreement in an attempt to resolve SWEC's alleged breach. The parties continued to perform their respective obligations under the Agreement until May 2000.

By letter dated May 4, 2000, Maine Yankee stated it was terminating the Decommissioning Agreement. The letter set out three grounds for termination, including the insolvency of SWEC, SWEC's failure to cure previously identified defaults, and SWEC's failure to perform its obligations under the Agreement. The allegedly unperformed obligations included SWEC's failure to provide a project schedule, make adequate progress on the project, obtain necessary regulatory approvals, adequately administer the work, complete perfor-

mance of the Agreement, and pay its subcontractors and suppliers. Article 11.1.1 provides that Maine Yankee could terminate the Agreement if SWEC were insolvent. The debtors and Maine Yankee agree that SWEC was insolvent, within the meaning of the Agreement and 11 U.S.C. § 101(32)(A), as of May 1, 2000.

Also on May 4, 2000, SWEC sent to Maine Yankee its monthly invoice for April 2000 in the amount of $6,328,314. SWEC did not provide the required lien waivers from the subcontractors with the invoices and admits it had not paid the subcontractors at the time.

On May 10, 2000, the parties entered into an Interim Service Agreement. The Interim Agreement established terms "to mitigate the damages and adverse consequence of an abrupt or inefficient demobilization at the Maine Yankee site as a result of [the termination notice] and other contested issues among the parties . . . ." Under the Interim Agreement, the parties continued to perform their obligations under the Decommissioning Agreement, but with certain alterations. Maine Yankee agreed to pay $5,100,789.36 to subcontractors, suppliers, vendors, and consultants for goods and service provided prior to May 1, 2000 and SWEC agreed to provide lien waivers for all work presented in the April 2000 invoices. Also, Maine Yankee agreed to pay charges and reimbursable costs directly to the subcontractors, rather than through SWEC. The Interim Agreement provided that both parties reserved their rights under the Decommissioning Agreement. A later amendment to the Interim Agreement continued this arrangement through September 30, 2000.

On May 30, 2000, Maine Yankee's contracts manager, Michael Evringham, sent a letter to Ken Jenkins, assistant general counsel for both SWINC and SWE & C. In that letter, Maine Yankee demanded

that SWINC & SWE & C "honor and fulfill their obligations guaranteeing the performance of [SWEC] under its agreement with Maine Yankee ..." On May 31, 2000, Jenkins responded to Maine Yankee's demand on behalf of both SWINC and SWE & C. His letter disputed whether SWEC's obligations under the Agreement were terminated and refused to either "admit or deny liability for any 'damages and costs' arising from the termination[,] particularly because no ... bill of costs has been tendered." The letter did state however that "the Guarantors want to work with all parties to mitigate the damages for whomever may ultimately be liable. The Guarantors are ready, willing, and able to complete the obligations of the Contract Agreement, and the Guarantors hereby tender their performance to complete the work of the Guaranteed." The letter went on to request Maine Yankee's acceptance of this tender and stated that SWINC and SWE & C considered "themselves discharged from any further obligations under the Parent Guarantees" if Maine Yankee did not accept the tender.

On June 2, 2000, the debtors all filed voluntary petitions for relief with this court.

Maine Yankee responded to SWINC and SWE & C's May 31 letter in a letter dated June 5, 2001. In its response, Maine Yankee reasserted its position that SWEC was liable for its breach of the Decommissioning Agreement and stated that it would inform SWINC and SWE & C of its damages from that breach "as soon as is reasonably practicable." The letter concluded with a statement that Maine Yankee considered SWINC and SWE & C's "attempt to unilaterally discharge [their] obligations to Maine Yankee ... without legal effect."

On June 6, 2000, Jerome P. Kane, Vice President and Project Director, responded on behalf of SWINC and SWE & C to Maine Yankee's June 5 letter. He stated that SWINC and SWE & C assumed from the June 5 letter that Maine Yankee had refused their tender of performance. Maine Yankee responded with a letter the next day stating that its position was unchanged from its June 5 letter.

On August 23, 2000, Maine Yankee filed a proof of claim in the amount of $78.2 million against SWEC and filed nearly identical claims against SWINC and SWE & C as guarantors of SWEC's performance under the Decommissioning Agreement.

At a one-day non-jury trial on February 13, 2001, this court heard testimony and argument on the debtors' threshold defenses to Maine Yankee's claim. The debtors argued that Maine Yankee did not properly terminate the Agreement and did not have an enforceable right to damages. The debtors also argued that the court should disallow Maine Yankee's claims because Maine Yankee continued to hold property owing to the debtor's estate. On July 26, 2001, the court issued a memorandum opinion in which it found that Maine Yankee properly terminated its Agreement with SWEC and thus could make an enforceable claim for damages under the Agreement. The court also rejected the debtors' defense that Maine Yankee's payments made directly to subcontractors were avoidable under §§ 547 and 548. Last, the court addressed SWEC's assertion that Maine Yankee owes it $1,227,524.64 as a mature debt payable on SWEC's portion of the April 2000 invoice submitted to Maine Yankee. The court found that it did not have enough information to resolve whether the parties had a mutual indebtedness and instead recognized that § 553 of the Code provides for a right of setoff.

On July 5, 2001, Maine Yankee filed amended proofs of claim against SWEC, SWINC, and SWE & C. The amended claim against SWEC was filed in the amount of $39,490,366, of which $12,395,287 is based on equitable subrogation claims asserted on behalf of subcontractors who were paid directly by Maine Yankee instead of by SWEC. The remaining $27,095,079 is based on Maine Yankee's claims for breach of contract. The $27,095,079 damages figure assumes that Maine Yankee will recover $37,904,921 under a performance bond issued by the Federal Insurance Company. Pursuant to Article 11.4 of the Decommissioning Agreement, Maine Yankee's recovery of funds from Federal must be credited to the unpaid Agreement funds to determine damages. Maine Yankee's recovery from Federal is being litigated in a pending proceeding in the United States District Court for the District of Maine. The amended claims against SWINC and SWE & C each contain the same assumption that Maine Yankee will recover from Federal and are filed in the amount of the contract claims, $27,095,079.

On August 20, 2001, Maine Yankee's counsel sent a letter to the debtors' counsel, seeking the debtors' consent to relief from the automatic stay so that Maine Yankee might serve upon SWEC an invoice of its costs of completion, in accordance with Article 11.4 of the Decommissioning Agreement.

## II. DISCUSSION

### A. *Summary Judgment Standard*

The debtors' motions seek partial summary judgment to eliminate or reduce Maine Yankee's claim for damages resulting from SWEC's alleged breach of the Decommissioning Agreement. Under Federal Rule of Civil Procedure 56(c), made applicable to bankruptcy proceedings by Rules 7056 and 9014 of the Federal Rules of Bankruptcy Procedure, summary judgment should be granted when "the pleadings, deposition, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56 requires that the debtors, as the moving party, bear the initial burden of informing the court of the basis for its motion and demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact is present when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party, has shown an absence of genuine issue of material fact, it is incumbent upon the non-moving party, Maine Yankee, to "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citing Rule 56(e)).

■ In this case, the debtors' motions require interpretation of the Decommissioning Agreement. Under Maine law, the interpretation of an unambiguous contract is an issue of law, but the interpretation of an ambiguous contract is a question of fact. *See Hawkes v. Commercial Union Insurance Co.*, 764 A.2d 258, 266–67 (Me. 2001). Whether a contract is ambiguous is a question of law for the court. *See Villas by the Sea Owners Ass'n v. Garrity*, 748 A.2d 457, 461 (Me.2000). A "contractual provision is considered ambiguous if it is reasonably possible to give that provision at least two different meanings." *Id.*

Thus, to succeed on its motions for partial summary judgment, the debtors must demonstrate that the provision of the Decommissioning Agreement on which they rely are unambiguous and support their position. To defeat the debtors' motions, Maine Yankee need only show that the Agreement is ambiguous or that the unambiguous meaning of the provision rebuts the debtors' argument.

B. *Are Maine Yankee's damages capped by the Decommissioning Agreement?*

■ The debtors argue that Article 30.2 of the Decommissioning Agreement caps SWEC's liability at $65 million. They argue that the Agreement is clear and unambiguous and that, under Maine law, must be given its ordinary meaning. *See Guilford Transp. Indus. v. Public Utils. Comm'n,* 746 A.2d 910, 914 (Me.2000). It is the debtors' position that they are thus entitled to summary judgment limiting Maine Yankee's claim to $65 million.[1]

■ Maine Yankee agrees with the effect of Article 30.2 of the Decommissioning Agreement. It acknowledges that its damages under the Agreement are limited by that provision and states that it will not seek to recover more than $65 million for breach of contract. To the extent Maine Yankee's claims exceed that limitation, it argues that these claims are not based in the Agreement but instead reflect payments made by Maine Yankee directly to SWEC's subcontractors following SWEC's breach. Maine Yankee asserts that it has a right to make such claims under the theory of equitable subrogation. *See Associated Hosp. Serv. of Maine v. Maine Bonding & Cas. Co.,* 476 A.2d 189, 190 (Me.1984). Equitable subrogation is defined under Maine law as "the substitution of one person in place of another, whether as a creditor or as the possessor of any other rightful claim, so that he who is substituted succeeds to the right of the other in relation to the debt or claim and its rights remedies or securities." *Id.* at 190.

At the September 26th hearing, the Official Committee of Unsecured Creditors, which joined the debtors' motion for partial summary judgment, also argued that none of the cases cited by Maine Yankee actually found equitable subrogation to exist and thus it had proffered no support establishing that equitable subrogation was recognized under Maine law. *See McCain Foods, Inc. v. Gerard,* 489 A.2d 503, 504 (Me.1985) (holding equitable subrogation was unavailable to an insurer because it was the primary obligor and thus contractually liable to the insured); *Associated Hosp. Serv.,* 476 A.2d at 190 (assuming insurer had a right of subrogation but denying its claim against a tortfeasor's insurance company because there was no final judgment against tortfeasor). The Committee did not produce any precedent, however, indicating that equitable subrogation is unavailable in Maine, even if it was not available under the circumstances of the cases cited by Maine Yankee. Because the Supreme Judicial Court of Maine applied equitable subrogation in those cases, even if the doctrine was unavailable under their particular facts, this court finds that Maine recognizes the doctrine. *See In re Menna,* 16 F.3d 7, 10 n. 4 (1st Cir.1994) (citing *McCain Foods* for the proposition that Maine law permits equitable subordination claims).

---

1. Because Maine Yankee has not sought relief from the debtors' insurers, the debtors contend that the provision of § 30.2 adding insurance proceeds to the total limitation on liability is irrelevant.

■ Thus, this court must resolve whether Maine Yankee can maintain claims in excess of $65 million by asserting the equitable subrogation claims originally belonging to the subcontractors. In interpreting a contract under Maine law, the court must begin with the language of the agreement and determine whether it is ambiguous. *See Guilford Transp. Indus.*, 746 A.2d at 914. Maine Yankee asserted at oral argument that Article 30.2 is ambiguous and does not foreclose its relief on the equitable subrogation claims. It did not identify, however, exactly what words of the Decommissioning Agreement Maine Yankee thinks are susceptible to different meanings and therefore ambiguous.

Alternatively, Maine Yankee submits that equitable subrogation claims are unambiguously permitted by the language of Article 30.2, which limits SWEC's "total aggregate liability from any and all claims, arising out of or in connection with its services hereunder" to $65 million. According to Maine Yankee, the equitable subrogation claims it submits for payments it made directly to the subcontractors do not arise out of or in connection with SWEC's services under the Decommissioning Agreement, but rather are claims based independently on the contractual obligations that exist between SWEC and its subcontractors. Maine Yankee relies upon the phrase "arising out of or in connection with [SWEC's] services" to distinguish its equitable subrogation claims from those arising directly from the Decommissioning Agreement.

The court finds no ambiguity in the contested provisions of Article 30.2. The court agrees with Maine Yankee that the "arising out of" phrase would limit the cap to claims under the Agreement, but the phrase "in connection with [SWEC's] services" unambiguously broadens the covered claims to include those claims that do not "arise out of" the Agreement, yet are nonetheless "connected with SWEC's services." This latter group of claims "connected with" SWEC's services would include those seeking relief for SWEC's actions taken to complete the decommissioning project. Because the payment of subcontractors is a service provided by SWEC to complete the decommissioning project, the court finds that Maine Yankee's equitable subrogation claims are included under the damages cap pursuant to the plain and unambiguous meaning of "in connection with [SWEC's] services."

The "arising out of" and "in connection with" clauses of Article 30.2 must have different meanings. If they do not, then one or the other would be rendered superfluous. Furthermore, the Decommissioning Agreement treats the two phrases differently. For example, Article 30.3 provides that Maine Yankee's remedies under the Decommissioning Agreement are its "exclusive remedies for liabilities of SWEC *arising under* this Agreement." (emphasis added) Article 30.3 does not contain the "in connection with" language, thereby implying that claims asserted by Maine Yankee that are "in connection with" the decommissioning, but do not "arise under" the Agreement, can exist and can be subject to different remedies than provided for in the Agreement. Because the equitable subrogation claims are still capped by Article 30.2, however, even if different remedies are employed for claims "in connection with" the decommissioning, the damages must still be limited to $65 million.

The second sentence of Article 30.2 also confirms that the damages cap applies to Maine Yankee's equitable subrogation claims. It states that "Maine Yankee hereby releases and agrees to defend and indemnify [SWEC] and its Subcontractors

(of any tier), and their affiliates and employees from any further liability for any loss or damage in excess thereof." Thus, while the first sentence of Article 30.2 is limited to claims arising under or in connection with the Decommissioning Agreement, the second sentence is not so constrained. It provides that Maine Yankee releases SWEC and the subcontractors from liability in excess of the $65 million and states that Maine Yankee will "defend and indemnify" SWEC and the subcontractors for further liability. Because the second sentence is not limited to the claims under the Decommissioning Agreement, it applies to claims other than those of Maine Yankee and SWEC. This includes claims such as those of the subcontractors against SWEC, on which Maine Yankee's equitable subrogation claims are based. Because Maine Yankee released SWEC from liability in excess of $65 million and because it agreed to defend and indemnify SWEC from further liability, Maine Yankee cannot now assert claims in excess of that amount simply because it asserts the claims inherited from another party.

C. *Are Maine Yankee's claims for damages under the Decommissioning Agreement ripe?*

The debtors argue that Maine Yankee's claims for damages under the Decommissioning Agreement are not ripe because Maine Yankee has not satisfied the Agreement's conditions precedent to the award of damages. It asserts that Article 11.4 of the Agreement sets forth two conditions precedent to Maine Yankee's claim; first, Maine Yankee must finish the work provided for in the Agreement; second, Maine Yankee must submit an invoice to SWEC and permit it 30 days to make payment. The debtors argue that until Maine Yankee completes the work to be done under the Decommissioning Agreement and submits an invoice, its damages will be indefinite and unripe.

As an example of the unripeness of the damages, the debtors note that Maine Yankee has a pending suit against the United States Department of Energy for recovery of costs incurred in storing spent reactor fuel. The debtors argue that if Maine Yankee recovers damages in that suit, then Maine Yankee's cost to complete the project will be reduced and the damages payable by SWEC and its guarantors will be lessened.

Maine Yankee presents three arguments in response. First, it argues that it has a ripe claim and the potential uncertainty in calculating its damages does not make its damages unripe. Second, it asserts that the definition of "claim" under the Bankruptcy Code, 11 U.S.C. § 101(5)(A), does not require claims to be fixed and mature. Rather, the Code permits courts to allow "contingent or unmatured" claims. 11 U.S.C. § 502(b)(1). Last, Maine Yankee asserts that an invoice under Article 11.4 of the Decommissioning Agreement is not a condition precedent to its bankruptcy claim and, in any event, Maine Yankee requested SWEC's consent to a relief of the automatic stay to serve an invoice on SWEC.

While the debtors' motion for summary judgment purports to challenge the ripeness of Maine Yankee's claims, it instead invokes the existence of a condition precedent to support its argument. The debtors' argument does not assert that Maine Yankee's *claim* for breach of the Decommissioning Agreement is unripe, but only that the *award of damages* for that breach is unripe because they have not yet been completely quantified and will not be until the decommissioning is complete. The alleged prematurity of Maine Yankee's assertion of damages is founded, not on any weakness of its claim for breach of con-

tract, but on what the debtors assert is a "condition precedent" in Article 11.4. To succeed on its motion for summary judgment, the debtors must establish that Article 11.4 unambiguously creates this condition precedent. *See Hopewell v. Langdon,* 537 A.2d 602, 604 (Me.1988) ("The construction of an unambiguous written contract presents a question of law for the court to determine."). Specifically, the debtors must show that Article 11.4 requires that all of the costs to complete the decommissioning have accrued before Maine Yankee can state a claim for damages.

■ Article 11.4, however, is not as clear as the debtors assert. It provides only that the measure of damages shall be Maine Yankee's cost incurred to complete the decommissioning, less any of the contract price unpaid to SWEC. The Article does not state that final calculation of the costs of completion is a prerequisite to any damage award. The cost to complete is described as "the total direct damages and costs incurred by Maine Yankee to finish the Work." Thus, the debtors' asserted condition precedent rests solely on Article 11.4's description of the available damages in the past tense. Article 11.4 does not unambiguously create a condition precedent solely because it uses the past tense. There is no reason that Maine Yankee's costs to complete the work, if incurred prior to the final completion of the decommissioning, are unrecoverable under Article 11.4. Thus, the court finds that Article 11.4 does not create a condition precedent that Maine Yankee must complete the project before claiming damages.

■ Even if the court were to conclude otherwise and find that Article 11.4 created an unfulfilled condition precedent, Maine Yankee could nonetheless assert its claim because, as Maine Yankee notes, the fact that claims are unripe is not a basis for denying bankruptcy claims. Maine Yankee was required to file its proof of claim by the bar date established in this action. When it did so, the cost to complete the decommissioning of its plant remained uncertain because the project was, and is, ongoing and likely to require several years to complete. Section 502(b) of the Bankruptcy Code provides that courts should determine the value of a claim, "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor under any agreement or applicable law for a reason *other than because such claim is contingent or unmatured;* ..." 11 U.S.C. § 502(b)(1). Thus, claims may be allowed in bankruptcy even if they remain contingent. As explained by the Ninth Circuit, "[i]t is well-established that a claim is ripe as an allowable claim in a bankruptcy proceeding even if it is a cause of action that has not yet accrued." *In re Cool Fuel, Inc.,* 210 F.3d 999, 1006 (9th Cir.2000). Similarly the Third Circuit has recognized "that a party may have a bankruptcy claim and not possess a cause of action on that claim." *In re Remington Rand Corp.,* 836 F.2d 825, 832 (3d Cir.1988). Put differently, even if this court were to find that Article 11.4 contained an unfulfilled condition precedent that Maine Yankee complete the decommissioning project and that therefore Maine Yankee's cause of action for breach of the Agreement had not yet accrued, the pendency of the unfulfilled condition would not prevent the court from allowing Maine Yankee's bankruptcy claim.

This conclusion applies with equal force to the debtors' second asserted condition precedent—that Article 11.4 requires Maine Yankee to submit an invoice for payment to SWEC. Even if the court were to interpret Article 11.4 to require Maine Yankee to submit an invoice to SWEC for its damages, the fact that this

condition precedent was unfulfilled would not prevent Maine Yankee from submitting a contingent claim for its damages.[2] *See In re Remington Rand Corp.*, 836 F.2d at 832. Thus, the quantity of Maine Yankee's damages, if proven, remains an issue for the court's consideration and possible estimation pursuant to 11 U.S.C. § 502(c).

### D. Did Maine Yankee fail to mitigate its damages by refusing to accept the offer of performance by SWINC and SWE & C?

 The debtors move for summary judgment limiting Maine Yankee's damages to zero on the basis that Maine Yankee failed to mitigate its damages by accepting the proffer of performance made by SWEC's guarantors under the Agreement, SWINC and SWE & C. SWEC argues that SWINC and SWE & C tendered their performance in satisfaction of their guarantees in a letter dated May 31, 2000 to Maine Yankee from Jerome Kane, SWEC's Vice President and Project Director. That letter stated that "[t]he Guarantors are ready, willing, and able to complete the obligations of the Contract Agreement, and the Guarantors hereby tender their performance to complete the work of the Guaranteed." It went on to contain a signature line by which "the Guarantors will immediately assume all responsibility for completing the work" and stated that "[i]f this is not acceptable to Maine Yankee, the Guarantors consider themselves discharged from any further obligations under the Parent Guarantees."

Maine Yankee responds that the May 31, 2000 letter and other correspondence between the parties is insufficient to show that Maine Yankee failed to use reasonable efforts to mitigate its damages. Particularly, Maine Yankee contends that the evidence does not establish, for purposes of summary judgment, that it was unreasonable in failing to accept SWINC and SWE & C's tender of performance, or that acceptance of that tender would have had the effect of minimizing the damages caused by SWEC's alleged breach.

 Under Maine law, "[a]s a general rule, a plaintiff has a 'duty' to use reasonable efforts to mitigate his or her damages." *Marchesseault v. Jackson*, 611 A.2d 95, 99 (Me.1992). The burden of proving the plaintiff's failure to mitigate his or her damages, however, rests with the defendant. *See Doughty v. Sullivan*, 661 A.2d 1112, 1122 n. 14 (Me.1995) ("The defendant has the affirmative burden to plead and prove plaintiff's failure to mitigate damages."). Thus, it is SWEC's burden to prove that Maine Yankee failed to satisfy its duty to use reasonable efforts to mitigate its damages.

The debtors' argument for summary judgment on this point is premised solely upon the documentary evidence establishing that SWINC and SWE & C's tendered their performance on May 31, 2000. While Maine Yankee cannot contest that SWINC and SWE & C made such an offer, there is very little evidence contained in the record of exactly what SWINC and SWE & C would do in satisfaction of their guarantee obligations. The parent guarantees contained in Appendix I of the Decommissioning Agreement provide that SWINC and SWE & C each "guarantee[ ] [SWEC's] performance of the Agreement up to an amount equivalent to fifty percent (50%) of the Agreement's unpaid balance of the contract price." The May 31 letter itself

---

**2.** Thus, the court need not determine whether Maine Yankee's request that SWEC consent to the waiver of the mandatory stay so that it

might file such an invoice was effective to satisfy this asserted condition precedent.

14

does not provide further specificity and in fact refuses to admit or deny "liability for any 'damages and costs' arising from the termination particularly since no such bill of costs has been tendered." Thus, at the same time that SWINC and SWE & C were purportedly tendering their performance, they refused to acknowledge the existence of liability at all.

Furthermore, just three days after SWINC and SWE & C tendered their performance pursuant to the parent guarantees, both companies filed bankruptcy petitions. Thus, it is unclear whether either SWINC or SWE & C could have satisfied their guarantor obligations and therefore successfully mitigate Maine Yankee's damages even if recognized those damages and endeavored to remedy SWEC's breach. Indeed, it is unclear whether the short period of time between the May 31 letter and the filing for bankruptcy protection provided Maine Yankee with a reasonable opportunity to respond to SWINC and SWE & C's offer.

Given the uncertainty surrounding SWINC and SWE & C's tender of performance, the court cannot find that the facts presently on the record prove that Maine Yankee failed to take reasonable efforts to mitigate its damages by not accepting those tenders. Particularly, the mere tender of performance, without more, does not establish, without a genuine issue of material fact, whether the refusal of that tender was unreasonable. Similarly, the mere tender of performance does not show that SWINC and SWE & C could have satisfied their obligations under the parent guarantees and that, by doing so, they could have entirely mitigated Maine Yankee's damages. Thus, the evidence does not, at this time, entitle SWEC to summary judgment on its affirmative defense of Maine Yankee's failure to mitigate its damages.

## III. CONCLUSION

The court will enter an order granting the debtors' motion for summary judgment limiting damages to the amount specified in Article 30.2 of the Decommissioning Agreement. It will deny the debtors' motions for summary judgment on the ripeness of Maine Yankee's damages claim and on Maine Yankee's alleged failure to mitigate damages by accepting the tender of performance of SWINC and SWE & C. Thus, the debtors' defenses that Maine Yankee's claims are indefinite or unripe and that Maine Yankee failed to mitigate its damages remain for trial.

## ORDER GRANTING AND DENYING DEBTORS' MOTIONS FOR PARTIAL SUMMARY JUDGMENT

For the reasons set out in the court's November 21, 2001 memorandum opinion,

**IT IS HEREBY ORDERED THAT:**

1. Debtors' Motion for Partial Summary Judgment on Maine Yankee Atomic Power Company's Damage Claims (Contractual Damages Cap) (Docket Item 1970) is granted and Maine Yankee's damages will be limited to the amount specified in Article 30.2 of the Decommissioning Agreement.

2. Debtors' Motion for Partial Summary Judgment on Maine Yankee Atomic Power Company's Damage Claims (Ripeness of Claim) (Docket Item 1895) is denied.

3. Debtors' Motion for Partial Summary Judgment on Maine Yankee Atomic Power Company's Damage Claims (Failure to Mitigate by Accepting SWINC and SWE & C Offer) (Docket Item 1969) is denied.